**UNITED STATES of America**

v.

**John WILLIAMS, Appellant in No. 89–3093.**

**UNITED STATES of America, Appellant in No. 89–3184,**

v.

**John WILLIAMS.**

**UNITED STATES of America, Petitioner in No. 89–3307,**

v.

**John WILLIAMS, Actual Respondent,**

**The Honorable William L. Standish, Nominal Respondent.**

**Nos. 89–3093, 89–3184 and 89–3307.**

United States Court of Appeals, Third Circuit.

Argued Oct. 16, 1989.

Decided Dec. 26, 1989.

Rehearing and Rehearing In Banc Denied Jan. 25, 1990.

Thomas S. White, Joel B. Johnston (argued), Asst. Federal Public Defenders, George E. Schumacher, Federal Public Defender, Pittsburgh, Pa., for appellant/appellee/respondent.

Constance M. Bowden (argued), Asst. U.S. Atty., Charles D. Sheehy, Acting U.S. Atty., Pittsburgh, Pa., for appellee/appellant/petitioner.

Before BECKER, COWEN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

John Williams appeals from a judgment of conviction for possessing a gun as a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (1982 & Supp. V 1987).[1] We will affirm.

### I.

A jury could reasonably find the following facts. Larry Anderson spent Christmas day, 1987, drinking with friends in Clifton Park, on the North Side of Pittsburgh.[2] He returned to Wanda Gillmore's house at 860 Kirkbride Street and at 8:30 or 9 p.m. fell asleep in a living room chair. Wanda Gillmore is related to Anderson by marriage. She is also John Williams' sister.

About an hour and a half later, Anderson was awakened by a push. John Williams stood over him, saying he had a contract out on Anderson and three other people. Anderson, blurry from sleep, asked Williams what he meant, but Williams simply stared at him. Williams then said that Anderson owed him three dollars. Anderson replied that he had paid it back, to which Williams responded, "Well, I ought to shoot you." Williams began to pull a pistol from his side, then stopped, saying he would not use it in his sister's house. He pushed the pistol back and turned towards the door; then turned back

---

1. The relevant part of the statute provides:

   It shall be unlawful for any person—
   (1) who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year;
   ....
   to ... possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

   18 U.S.C. § 922(g)(1).

2. Anderson testified first that he drank two beers and two glasses of wine. App. at 540, 583. On cross-examination, he admitted he had been drinking all evening. App. at 584.

   He denied taking drugs that day. App. at 540. A defense investigator testified, however, that Anderson said he and his friends had been "partying up" all day, drinking and smoking cocaine. App. at 781.

and said, "Now I am going to shoot you." As Williams pulled out the pistol, Anderson got up from his chair and ran into the dining room. Williams fired. He chased Anderson between the dining and living rooms several times before running out of the house.

Anderson watched Williams leave and closed the door behind him. He went back to the living room and watched Williams cross the street to 853 Kirkbride, where Williams' sister Harriet Boyd lived. Shaken, Anderson sat in the living room until Wanda Gillmore arrived home about a half hour later.

Wanda Gillmore testified that when she walked into her house between 11 p.m. and midnight Christmas night, she found Anderson in the apartment, shaking. App. at 660. She asked what was wrong and Anderson told her that her brother, John Williams, had shot at him and chased him around the apartment. Gillmore smelled gunfire in the air and saw a bullet hole in the wall. App. at 661.

Gillmore left to talk to her sister Harriet Boyd about the shooting. When she arrived at Boyd's house, she found Williams lying on the couch. She asked him why he fired a gun in her house. She testified, "[H]e told me if I do not get out of his face, he would shoot me next." App. at 665. Gillmore could tell Williams had been drinking by the smell on his breath and the way he acted. She called the police.

Sergeant Edward L. Sorace of the Pittsburgh Police testified he was the first to arrive, shortly after the police received a call at 2:40 a.m. on December 26. App. at 676, 679. When he stepped out of his car, he smelled gun smoke in the air. He entered 860 Kirkbride, where Larry Anderson told him that John Williams had fired several shots at him inside the house. Anderson showed him a bullet hole in the back wall of the living room and said Williams had fled to a house across the street, number 853.

Sorace knocked on the door of 853 Kirkbride and was admitted. He found John Williams lying on the couch and Harriet Boyd talking on the telephone. Sergeant Sorace arrested Williams and asked him where the gun was, but Williams "didn't know anything about anything, about a gun or anything." App. at 677, 679. Williams was taken to the police wagon.

Sergeant Frederick Wolfe and Lieutenant John F. Mook arrived as Williams was being put in the wagon. Lieutenant Mook testified that when he entered 853 Kirkbride Street, Mrs. Boyd was sitting on a couch, talking on the telephone. He explained to Mrs. Boyd that the police were interested in finding the gun used in the shooting and, because the suspect had been arrested in her home, he thought the gun might be here as well. She granted him permission to search the house.

The officers began to search, which took some effort since the house was in disarray. Lieutenant Mook spoke to Mrs. Boyd again, saying that if she had the gun, he wished she would say so, since he hated to waste time.

Mrs. Boyd responded that she had a gun. App. at 698. She took Mook and other officers upstairs, went into a cupboard and took out a silver .22 revolver. Mook could tell the weapon had not been fired recently, since it was fully loaded and had no smell of gun powder on it.

Meanwhile, Officer William Seifer and his partner, searching downstairs, discovered a gun underneath the sofa. Seifer testified the gun smelled as if it had been fired recently.[3] Anderson later recognized the gun as the one Williams fired—a black revolver with a brown handle. The gun contained a spent shell. Dents on the shell matched the gun's firing pin.

Harriet Boyd also testified at her brother's trial. She first saw him at five or six o'clock on Christmas day. App. at 628–29, 633. At some point—Boyd could not remember the time—Williams left, saying he was going to Miss Sis's house. Williams

3. Estimates varied as to when the gun was fired. Officer Seifer stated the smell could remain on the gun for up to an hour. App. at 721. Sergeant Sorace estimated from the smell that the gun had been fired within the last ten or fifteen minutes. App. at 680–82.

was gone for forty-five minutes or an hour. When he returned, Williams told Boyd, "Tony and Larry stole the dope man's dope" and that he was going to get them. App. at 631. She understood that Williams was referring to Larry Anderson. Williams pulled a gun from his side and showed it to Boyd. She recalled it was a revolver, although she could not recall the color. When Williams showed her the gun, she said he should not have it. Williams did not reply.

Some controversy attended Mrs. Boyd's testimony. Like her brother John, she is a prior felon. She was convicted of manslaughter and on February 22, 1977, was sentenced to imprisonment of not less than eighteen months and not more than five years. She testified that she was taken to a halfway house two days after her conviction. She was "very sure" that she served eighteen months there, after which she was released. She could not remember whether she was released before or after October of 1978.[4]

On the basis of her testimony, the district court concluded that she had been released from custody more than ten years prior to the trial, which began on October 17, 1988. Therefore, the district court preliminarily determined that, pursuant to Fed.R.Evid. 609(b), her conviction was inadmissible for the purpose of impeaching her credibility generally.[5]

In addition, the defense argued the conviction was relevant to show bias. Since Boyd had a prior felony conviction and was found in possession of a gun, she was subject to indictment for the same offense as Williams. She therefore had a motive to ingratiate herself with the government in order to avoid indictment. The court reserved decision on admissibility of the conviction for this purpose until later in the trial. The court ultimately ruled the conviction was inadmissible to show bias.

Prior to trial, Dr. Ralph E. Tarter, a clinical psychologist, examined Williams for the purpose of evaluating his mental capacities and documenting any psychological disorders he might suffer. Tarter interviewed Williams on August 1, 1988 for a period of three to four hours, administering a variety of tests and conducting a structured psychological interview. Dr. Tarter set forth his findings in a written report, see Supplemental Appendix to the Response and Reply Brief of the United States, and in a videotaped deposition taken for purposes of presentation at trial, App. at 87–179.

Dr. Tarter found that Williams, a man in his forties, possessed a full scale IQ of 67 on the Wechsler Adult Intelligence Scale, placing him in the mentally retarded ranges of intelligence. His IQ is in the second percentile for intellectual capacity in the normal population.[6] He has a pervasive learning disability, limited capacity to exercise adequate judgment and very poor memory. His answers to the structured interview (the Diagnostic Interview Schedule) revealed that he generally drinks continuously during the day, and has done so since the age of seventeen, consuming approximately one-half gallon per day of whatever alcohol is available. Williams told the doctor he experienced "blackouts" on many occasions, which the doctor found consistent with his constant drinking.

---

**4.** At one point, Mrs. Boyd stated she *went* to the halfway house in 1978. App. at 503. Then she stated she was released from the halfway house in 1978. *Id.*

She recalled that when she was released, there was snow on the ground. App. at 503. We note this account conflicts with the rest of her testimony, which established February 1977 as the month she began serving her sentence and August 1978 as the date of her release. Certainly there was no snow on the ground in August of 1978.

**5.** The relevant part of Rule 609(b) provides:

Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

**6.** He was unable, for example, to accurately recite the alphabet and made numerous errors up to the letter G, where he stopped, not knowing what the next letter was. Supp.App. at 1.

Supp.App. at 2; App. at 139–40. In Dr. Tarter's opinion, the additive effects of the neurotoxins in cheap liquors may have contributed to Williams' cognitive deficiencies. Dr. Tarter also found Williams suffers from an antisocial personality disorder and when stressed is unable to restrain himself in a socially normative fashion.

It was Dr. Tarter's opinion that Williams was having a blackout at the time of the incident. App. at 155–57, 160. He based his opinion on Williams' fragmented memory of the events of Christmas day and Williams' admission that he had been drinking that day. App. at 157, 160.

According to Dr. Tarter, a blackout is caused by rapid absorption of alcohol in the body, such that there is too much alcohol in the system to be broken down. This causes the brain, in effect, to become anesthetized. In this condition, the brain cannot perform its regular functions and shuts down. Or, as Dr. Tarter put it, it "goes on automatic pilot, if you will, and that causes a blackout. The more general term is anterograde amnesia...." App. at 127.

Dr. Tarter proceeded to describe the effects of a blackout:

> [B]ecause the brain is not functioning in its normal way, events that occurred while the person was intoxicated are never put into the brain. We refer to that as the failure to consolidate memories, and it is not like the person forgets when they are sober because they can never get it back. It has just never gotten in because the brain can't function
>
> ....
>
> It is an anterograde amnesia to the extent that information happening now is lost in the future because it is not consolidated, and that's the consequence of a blackout, and alcoholics, of course, commonly have blackouts because they drink large amounts over extended periods of time and are, in effect, bathing their brains with alcohol.

App. at 128.

Persons in the blackout state nonetheless retain the ability to perform many ordinary physical tasks:

> The most profound example I can give is, I once had—he was actually a patient who was a pilot who flew a commercial plane from San Francisco to Hawaii in a blackout state. How this happens is that flying for this person is an automatic process. The skills are established....
>
> What is impaired is capacity to perform a task efficiently. What is not impaired is the ability to do—or, the appearance of being able to do ordinary and routine things. Thus, people who are in blackouts regularly drive their car home after a heavy bout of drinking at a bar, and they could be in a blackout and never know how they got home.

App. at 133–34.

Dr. Tarter testified that it is extremely difficult to tell from outward appearance whether a person is in a blackout. Blackouts, like other forms of anterograde amnesia, are measured after the fact.

In responding to the question whether a person in a blackout state is conscious, the doctor testified:

> They are not conscious in a normal sense. They are able to function as I mentioned on automatic pilot....
>
> So the issue, is the person aware, the answer is yes, at one level, but no at another level. And it's much like I said, akin to sleepwalking, where it seems the person is performing or behaving in a purposeful way, but yet, the person is not aware of self-awareness, if you will. They are not aware of their own self-awareness, [or] able to recall subsequent to the event those events.

App. at 136–37.[7]

Prior to trial, the government moved to exclude Dr. Tarter's testimony from evi-

---

**7.** The doctor gave a similar account during cross-examination:

> One could ask a person who is sleepwalking, "What are you doing down here making a ham sandwich," and you will get a perfectly articulated answer, and the question is, is the person conscious. That's the problem we have with that type of question in trying to divide up what we mean by conscious.
>
> Yes, the person is conscious to the extent that they are communicating, but they are not

dence. The trial court granted the motion, reasoning that the testimony did not show that Williams lacked intent or knowledge that he possessed the gun, but rather that he lacked the ability to remember or to be "aware of his self-awareness."

## II.

■ On appeal, Williams contends the district court erred in prohibiting the defense from cross-examining Harriet Boyd about her manslaughter conviction. The district court ruled the conviction was inadmissible for the purpose of (1) attacking credibility generally or (2) showing bias.

There was no error in the first ruling. Federal Rule of Evidence 609(b) prohibits impeachment based on convictions for which the witness was confined and released more than ten years prior to trial. Although Boyd's testimony was somewhat contradictory, there was sufficient evidence presented from which the district court could reasonably conclude that ten years had elapsed since Boyd's release from custody. The court's finding was not clearly erroneous.

■ The court erred, however, in prohibiting reference to the conviction in order to show bias. The Confrontation Clause of the Sixth Amendment guarantees criminal defendants the opportunity to cross-examine witnesses against them. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). Revealing a witness's bias or motivation in testifying is among the proper and important functions protected by the right to cross-examination. *Davis*, 415 U.S. at 316–17, 94 S.Ct. at 1110–11. Trial judges nonetheless retain wide latitude under the Confrontation Clause in limiting cross-examination to avoid harassment, prejudice, confusion of the issues or interrogation that is repetitive or only marginally relevant. *Delaware v.*

*Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

In this case, however, the trial court prohibited *all* inquiry into the possibility that Boyd was biased. This we find to be an abuse of discretion, *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931), and a violation of rights secured by the Confrontation Clause. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435.

The government argues the trial court correctly barred cross-examination because Boyd's manslaughter conviction and gun possession were irrelevant to show bias. There was no evidence to suggest that Boyd, rather than Williams, held and fired the gun. There was no support for the theory, therefore, that Boyd was attempting to shift suspicion away from herself by falsely accusing her brother.[8] Indeed, the evidence is to the contrary. Boyd voluntarily showed policemen her own gun, perhaps in an attempt to keep them from finding her brother's.[9] This, the government argues, shows that Boyd had little concern about incriminating herself—she would rather help her brother.

The government's argument goes to the weight and not the relevance of the conviction. It is equally conceivable that when the full consequences of gun possession became apparent to Mrs. Boyd—once her brother became a subject of a federal grand jury investigation and a defendant in a criminal trial—she became fearful of being indicted for the same crime. In an effort to gain favor with federal authorities, as well as to focus attention away from herself, she may have decided to testify falsely against her brother in the grand jury and at trial. The defense was entitled to develop facts to support this theory through proper cross-examination. The trial judge's decision to preclude all reference

conscious to the extent that they are aware of their own awareness. App. at 150.

**8.** *Cf. Davis v. Alaska,* 415 U.S. at 311, 94 S.Ct. at 1108 (defense should be allowed to show that the witness might have falsely identified Davis as the culprit in order to shift suspicion away

from himself as the one who robbed the Polar Bar).

**9.** She admitted that the police arrested her that night and charged her with hindering the investigation. App. at 653. The charges were subsequently dropped. App. at 654–55.

to her prior conviction was therefore an abuse of discretion.

The error, however, was harmless beyond a reasonable doubt. Our standard of review was articulated in *Delaware v. Van Arsdall:*

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony is cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438.

There is little doubt that Williams is guilty of possessing a gun, and much worse. He admitted as much to Wanda Gillmore when he told her, if she didn't get out of his face, he'd shoot her next. Larry Anderson's testimony stands uncontradicted. Though he admitted to drinking during the day, and told the defense investigator he had smoked crack that day, he consistently told the police, the grand jury, the jury and the defense investigator that John Williams fired a gun at him. The bullet hole in the wall and the smell of smoke in the air—confirmed by Gillmore and Sergeant Sorace—are overwhelming proof that the gun was fired in the house. That the gun was found under the couch where Williams lay, still smelling of gun powder, is strong circumstantial evidence that Williams is the one who fired it. In combination with Anderson's testimony and Williams' threat to shoot Gillmore next, the proof of Williams' guilt is overwhelming.[10]

By contrast, taken even in the best light, the defense's theory of bias is not convincing. Mrs. Boyd volunteered to show police her own gun, apparently in an attempt to draw attention from her brother's gun. She thus willingly exposed herself to criminal liability for his sake. It is difficult to believe the same woman would turn against her brother in front of the grand jury and the jury.

Boyd was subjected to extensive cross-examination on other subjects. She admitted that she received a witness fee to appear before the grand jury. App. at 648–49. She was questioned extensively about inconsistencies in her prior statements to government agents and the grand jury. App. at 635–40, 646–54. She admitted she had been drinking on the day of the occurrence. App. at 638. She admitted she was familiar with guns because guns "had been around in her family." App. at 634–35.

Despite extensive cross-examination, her testimony is consistent in material respects with Larry Anderson's.[11] According to

---

**10.** Williams contends that the prosecutor himself admitted Anderson's testimony was insufficient ground upon which to base the prosecution. To wit:

> I will tell you this, ladies and gentlemen, if it was just a matter of Larry Anderson coming in here and testifying to you, then I really question whether or not we would be here....

App. at 983.

Williams does not quote the rest of the prosecutor's remarks:

> [B]ut that is not the case. Larry Anderson's testimony, what he said, was corroborated. It was corroborated by not two other witnesses. [Defense counsel] said that this case really turns on two witnesses. I believe the evidence of possession is what he said came from two people. [He] and I do not see this case the same way at all. As far as the Government is concerned, the evidence of possession in this case came from 12 people, 12 witnesses, who were called by the Government to paint the picture for you, the ladies and gentlemen of the jury, of what occurred to allow you to develop the insight that you need in order to determine what the truth is. It wasn't two people.

*Id.*

The prosecutor stated what we have stated here; that Anderson's testimony, in conjunction with Gillmore's, Sorace's and the other police officers', is overwhelming proof of Williams' guilt.

**11.** The defense emphasized both at trial and on appeal the discrepancy between Anderson's and Boyd's recollection of the time various events

Boyd, Williams said he was going to get Larry, which Boyd understood to mean Larry Anderson. App. at 630–31. Boyd, like Anderson, said Williams kept the gun at his side, App. at 630, and that the gun was a revolver. App. at 632.

It is highly unlikely that additional cross-examination on bias would have led the jury to treat Boyd's testimony any differently. The evidence of bias was less than persuasive, cross-examination on other subjects was extensive, and Boyd's testimony was consistent with others'. In addition, the jury need not have believed Boyd in order to convict Williams. As discussed above, Anderson and Gillmore's testimony, in combination with the observations of Pittsburgh police officers, provided overwhelming proof of Williams' guilt. In all, there is no reasonable possibility that additional cross-examination directed at Boyd's bias would have affected the judgment.

We conclude that the limitation of cross-examination was error, but harmless error beyond a reasonable doubt.

### III.

██ Williams argues that the district judge improperly excluded Dr. Tarter's testimony from evidence. The testimony was offered to show that Williams was probably having a blackout on Christmas night; that therefore he did not have the mens rea required for committing the crime, i.e., he was so drunk that he did not knowingly possess the gun.

██ Evidence of voluntary intoxication can be introduced to negate the specific intent required to commit a particular crime. It has been held repeatedly, however, that the crime defined in section 922(g) is a crime of general intent. *See, e.g., United States v. Hatfield*, 815 F.2d 1068, 1072 (6th Cir.1987); *United States v. Weiler*, 458 F.2d 474 (3d Cir.1972). For general intent crimes, evidence of volun-

tary intoxication is not an acceptable method of negating the required intent.

Williams argues that our decision in *United States v. Pohlot*, 827 F.2d 889 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988), requires a different result. We disagree. *Pohlot* interpreted the Insanity Defense Reform Act, 18 U.S.C. § 17 (Supp. V 1987), as excluding all evidence of mental abnormality "that does not support a legally acceptable theory of lack of mens rea." 827 F.2d at 906. For crimes of general intent, voluntary intoxication is not an acceptable theory of lack of mens rea. This is not because general intent crimes require no proof of mens rea, but because the relevant mens rea has been established by a common law presumption, i.e., a person who voluntarily becomes intoxicated is presumed to intend all the actions that follow.

The district court was thus correct in excluding evidence of Williams' intoxication introduced for the purpose of negating mens rea.

### IV.

Williams' remaining arguments on appeal are without merit. It is important to note, for purposes of the following discussion, that prior to his conviction in this prosecution, Williams had been convicted three times for committing violent felonies under state law.[12]

### A.

██ Williams argues first that the district court erroneously determined that he is a career offender under the federal sentencing guidelines.

As it stood at the time Williams was sentenced, the Career Offender provision of the guidelines provided:

> A defendant is a career offender if (1) the defendant was at least eighteen

---

occurred. Aside from showing that the witnesses had a poor sense of time, the inconsistencies do not overcome the overwhelming proof that a gun was fired in Gillmore's house and that Williams was the one who fired it.

12. On April 18, 1966, he was convicted for burglary. App. at 902–05. On January 16, 1974, he was convicted for rape. App. at 906–09. On March 28, 1978, he was convicted for robbing a man and assaulting him with a baseball bat, causing the man to lose an eye. App. at 910–16.

years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1 (effective Jan. 15, 1988).[13]

A defendant is not a career offender under the guideline unless the offense for which he or she is convicted is a "crime of violence." Williams argues that under section 4B1.2(1) of the guidelines, possessing a gun as a convicted felon is not a crime of violence.

At the time of Williams' sentencing, section 4B1.2(1) provided that a "crime of violence" for purposes of sentencing was defined by 18 U.S.C. § 16. U.S.S.G. § 4B1.2(1) (effective Jan. 15, 1988).

Application Note 1 to section 4B1.2 provided:

"Crime of violence" is defined in 18 U.S.C. § 16 to mean an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or any other offense that is a felony and that by its nature involves a substantial risk that physical force against the person or property of another may be used in committing the offense. The Commission interprets this as follows: murder, manslaughter, kidnapping, aggravated assault, extortionate extension of credit, forcible sex offenses, arson, or robbery are covered by this provision. *Other offenses are covered only if the conduct for which the defendant was specifically convicted meets the above definition. For example, conviction for an escape accomplished by force or threat of injury would be covered; conviction for an escape by stealth would not be covered. Conviction for burglary of a dwelling would be covered; conviction for burglary of other structures would not be covered.*

U.S.S.G. § 4B1.2 commentary (n. 1) (effective Jan. 15, 1988) (emphasis added).

By analogy to the escape example, possessing a gun while firing it at Larry Anderson is a crime of violence; possession without firing the weapon is not. According to the Application Note, therefore, Williams committed a crime of violence. The district court's application of the Career Offender guideline was correct.

## B.

■ Finally, Williams argues the district court erred in applying both the sentence enhancement provision of 18 U.S.C. § 924(e)(1) (Supp. V 1987) and the enhanced punishment provisions of the Career Offender guideline simultaneously. He argues that he is effectively being punished twice for the same offense, in violation of the Double Jeopardy Clause of the Fifth Amendment. We find no merit in the argument.

Section 924 of Title 18 of the United States Code sets forth the penalties available for violations of 18 U.S.C. § 922. Section 924(e)(1) provides for imprisonment of not less than fifteen years for a person convicted of violating section 922(g) and who has previously been convicted of three violent felony offenses committed on separate occasions. As noted above, Williams has been convicted three times for violent felonies under state law.

When Congress provided for "imprisonment of not less than fifteen years," it meant a maximum of life. *United States v. Jackson,* 835 F.2d 1195, 1197 (7th Cir. 1987), *cert. denied,* 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988). In addition, Congress instructed the Sentencing Commission to "specify a sentence to a term of imprisonment at or near the maximum term" for repeat offenders. 28 U.S.C. § 994(h) (Supp. V 1987). The Career Offender guideline carries out Congress's intention by specifying sentencing ranges at or near the maximum.

13. Effective November 1, 1989, guidelines 4B1.-1, 4B1.2 and their application notes were amended. The amended guidelines have no application to this case, however, since they were not in effect on the date of sentencing. 18 U.S.C. § 3553(a)(4) (Supp. V 1987).

In Williams' case, the guideline provides for a sentence above the minimum of fifteen years—to wit, 360 months to life. The district court imposed a sentence of 360 months. Since the guideline range and the sentence actually imposed are well within the range authorized by statute, there is no double punishment: only a single substantial punishment for a violent offense committed by a recidivist. *See United States v. Garrett,* 712 F.Supp. 1327, 1333 (N.D.Ill. 1989).

## V.

Before imposing sentence, the district court ruled that the special assessment provision contained in 18 U.S.C. § 3013 (Supp. V 1987) was enacted in violation of the Origination Clause of the United States Constitution, art. I, § 7. Accordingly, the court did not impose a special assessment as part of Williams' sentence.

At No. 89–3184, the government appealed from the district court's order under 28 U.S.C. § 1291 (1982). The government also petitioned for a writ of mandamus at No. 89–3307. In light of our recent decision in *United States v. Simpson,* 885 F.2d 36 (3d Cir.1989), the government's appeal at No. 89–3184 must be dismissed for lack of jurisdiction. The petition for writ of mandamus will be granted and the district court will be directed to vacate its order and impose a special assessment.

## VI.

We will affirm the judgment of conviction. We will dismiss the government's appeal at No. 89–3184 for lack of jurisdiction. We will grant the government's petition for a writ of mandamus at No. 89–3307. The district court will be directed to vacate its order declaring 18 U.S.C. § 3013 unconstitutional and impose a special assessment.