F I L E D
United States Court of Appeals
Tenth Circuit

OCT 13 1998

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GARY JOSEPH BINDLEY,

Defendant-Appellant.

No. 97-3250

---

**Appeal from United States District Court
for the District of Kansas
(D.C. No. 96-CR-400049-3)**

---

Charles D. Dedmon, Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, with him on the brief), Topeka, Kansas, for the appellant.

Randy M. Hendershot, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with him on the brief), Topeka, Kansas, for the appellee.

---

Before **EBEL**, **HENRY**, and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Defendant Gary Joseph Bindley was convicted of armed bank robbery, in violation of 18 U.S.C. §§ 2113(a), (d), and 2, use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1), and 2, and conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371. Bindley challenges his convictions and sentence on appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Bindley, his roommate Jerry Penner, Jr., and a mutual friend Michael Walters, drove around the outskirts of Topeka, Kansas, on the morning of June 1, 1996, looking for psychedelic mushrooms to pick and ingest. After having no success, they stopped briefly at Walters' house where, according to Bindley, Bindley and Walters smoked a marijuana cigarette. When the three men left the house in Penner's car, Walters was carrying a .22 caliber semi-automatic pistol.

Later that morning the men drove to the Kaw Valley State Bank and, after driving away from the Bank to devise an escape route, they returned and parked the car approximately one block north of the Bank. Bindley took the pistol from Walters and walked into the Bank, but he returned approximately five minutes later and told Penner and Walters, "I'm sorry, I couldn't do it. I punked out." Record V at 114.

Walters told Bindley and Penner he intended to rob the Bank because he

"already had the money spent." Id. at 115. He put on the baseball hat and flannel shirt Bindley had been wearing and took the pistol. At Walters' direction, Penner drove around the block several times and parked the car in a different location. Walters got out of the car and walked into the Bank. He approached teller Sally Ann Hudson, handed her a plastic sack, pointed the pistol at her, and told her to put money in the sack. Hudson cooperated and filled the sack with approximately $5,034 in cash from her counter and drawer. Walters left the Bank, ran toward the car where Bindley and Penner were waiting, and jumped into the front passenger seat. The men drove to the west edge of town where they threw out the pistol, the baseball cap, and the flannel shirt. They also threw out a rifle Penner had been carrying in his car. The men then returned to Walters' house where they divided the money, with Penner and Bindley each receiving $1,000 and Walters receiving the remainder.

Penner and Walters were indicted on three counts in connection with the bank robbery and they pleaded guilty to two of the three counts. Bindley was charged with the same three counts. Count 1 charged Bindley with armed bank robbery, count 2 charged him with use of a firearm during and in relation to a crime of violence, and count 3 charged him with conspiring with Penner and Walters to commit bank robbery. After a jury trial, Bindley was found guilty of all counts. He was sentenced to concurrent terms of forty-one months on the

armed bank robbery and conspiracy convictions, and to a consecutive term of sixty months on the use of a firearm conviction, for a total sentence of 101 months' imprisonment. He was also ordered to pay $5,034 in restitution.

II.

**Sufficiency of the evidence**

Bindley contends the evidence at trial was insufficient to support his convictions for armed bank robbery (Count 1) and use of a firearm (Count 2). More specifically, he argues neither his presence at the scene of the criminal activity, nor his knowledge of the occurrence of criminal activity, demonstrates "he in any way knowingly acted for the purpose of aiding and abetting the commission of" the charged offenses. Opening Br. at 11.

We review de novo the question of whether the evidence at trial was sufficient. United States v. Ivy, 83 F.3d 1266, 1284 (10th Cir. 1996). Viewing the evidence and the reasonable inferences therefrom in the light most favorable to the government, we ask whether a reasonable jury could find defendant guilty beyond a reasonable doubt. We will reverse only if we conclude no reasonable jury could have reached the disputed verdict. Id.

Count 1 of the information charged Bindley with armed bank robbery, in

violation of 18 U.S.C. § 2113(a) and (d).[1] The jury was instructed in Instruction 8 that to convict Bindley of armed bank robbery, the government had to prove (1) money was taken from the care, custody, or possession of the Bank; (2) the taking was by force and violence or intimidation; (3) during the taking, employees of the Bank were either assaulted or their lives were put in jeopardy by use of a dangerous weapon or device; and (4) the deposits of the Bank were insured by the Federal Deposit Insurance Corporation.

Count 2 of the information charged Bindley with use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1). In accordance with the language of the statute, the jury was instructed in Instruction 14 that to convict Bindley of this charge, the government had to prove (1) a crime of violence was committed for which Bindley could be prosecuted in a court of the United States; and (2) during and in relation to commission of that crime, Bindley knowingly used a firearm.

We note Bindley does not dispute the evidence presented at trial demonstrates Walters' actions inside the Bank satisfied the essential elements of Counts 1 and 2. Instead, his challenge is focused on whether the evidence pertaining to his own conduct satisfied the necessary elements for aiding and

---

[1] Although 18 U.S.C. § 2113(a) encompasses attempted robberies, Count 1 of the information in this case charged Bindley only with actual commission of the robbery via an aiding and abetting theory.

abetting liability. The district court instructed the jury in Instruction 17 that Bindley could be found guilty of Counts 1 and 2 as an aider and abetter if the government proved (1) Bindley knew the crimes charged were to be committed or were being committed; (2) Bindley knowingly and willfully did some act for the purpose of aiding commission of the crimes; and (3) Bindley acted with the intention of causing the crimes to be committed. This instruction is consistent with the language of the aiding and abetting statute, 18 U.S.C. § 2(a), as well as with the law of this circuit. See, e.g., United States v. Jones, 44 F.3d 860, 869 (10th Cir. 1995) ("To be guilty of aiding and abetting, a defendant must willfully associate with the criminal venture and aid such venture through affirmative action.").

Viewing the record on appeal in the light most favorable to the government, we conclude the evidence presented at trial was clearly sufficient to allow the jury to find Bindley aided and abetted the charged crimes. Penner was the government's key witness and he testified that Bindley and Walters directed him to drive by the Bank on the morning of the robbery, that Bindley told him Bindley and Walters planned to rob the Bank, that Bindley purchased a compact disc at a store near the Bank so they would have a plastic bag for the money, that all three men were involved in planning an escape route, that Bindley helped Walters put the money away after the robbery while Penner was driving, that Bindley took

$1,000 of the robbery proceeds, that the men verbally agreed not to talk about the crimes or tell anyone what had happened, and that the men agreed to go to Lawrence on the afternoon following the robbery in an apparent attempt to avoid detection. Although Bindley denied his involvement in the charged offenses and testified he was under the influence of marijuana and some other unknown substance at the time Walters robbed the Bank, Penner testified none of the men had smoked marijuana and that Bindley was fully aware of what was happening. The evidence is sufficient to establish Bindley aided and abetted the charged crimes in that he was involved in planning the crimes, he was contemporaneously aware of commission of the crimes, he knowingly and willfully performed numerous acts to aid commission of the crimes, he acted with the intention of causing the crimes to be committed, and he knowingly and willfully performed acts after the crimes were committed to avoid their detection.

**Proof of FDIC insurance**

Bindley contends his convictions must be reversed because the government failed to prove the Bank was insured by FDIC at the time of the robbery. [2]

---

[2] Under 18 U.S.C. § 2113(f), the term "bank" is defined as "any member bank of the Federal Reserve System, and any bank . . . organized or operating under the laws of the United States, . . . any institution the deposits of which are insured by the Federal Deposit Insurance Corporation." Because all of the

(continued...)

Although Bindley acknowledges the bank teller who was robbed testified the Bank was federally insured by FDIC on the date of the robbery, he challenges her ability to testify as to this matter. According to Bindley, her "duties were at most counting money," and her testimony alone, without a certificate of insurance or some other proof of FDIC insurance, was insufficient to satisfy the insurance element.

Contrary to Bindley's arguments, no circuit appears to require that the FDIC insurance element be satisfied by a particular type of witness or a particular piece of evidence. For example, the Ninth Circuit has expressly rejected the argument that a bank official's testimony is necessary to prove the federally insured status of a bank, United States v. Chapel, 41 F.3d 1338, 1340 (9th Cir. 1994), and has instead held any bank employee's uncontradicted testimony of a bank's insured status is sufficient to support a jury's finding on this element. United States v. Corbin, 972 F.2d 271, 272 (9th Cir. 1992). This circuit has previously held the FDIC jurisdictional element can be satisfied by testimony from a bank auditor. See United States v. Sterling, 103 F.3d 145, 1996 WL 685663 (10th Cir. 1996) (table), cert. denied 118 S. Ct. 209 (1997); United States v. Darrell, 828 F.2d 644, 648 (10th Cir. 1987) ("A variety of other evidence . . .

---

[2](...continued)
charged crimes were dependent on robbery of a "bank," the government had to prove the Bank met this definition.

-8-

supporting the bank's insured status at the time of the offense, presented with or without the certificate, will satisfy the proof requirements.")  Similarly, the Second Circuit has held the element was satisfied by uncontroverted testimony from an FBI agent.  United States v. Pascarella, 84 F.3d 61, 71 (2d Cir. 1996).

Although we are troubled by the government's casual treatment of this element as seen by its failure to present evidence which would more clearly prove this element, [3] we conclude the bank teller's testimony was sufficient to support the jury's finding that the Bank was federally insured at the time of the charged crimes.  In reaching this conclusion, we emphasize Bindley "did not object to th[is] evidence, did not cross-examine the witness about it, and did not offer any contrary evidence of his own."  Pascarella, 84 F.3d at 71.  We further note although Bindley moved for judgment of acquittal at the close of the government's case and again at the conclusion of all evidence, he did not argue dismissal should be granted because of the government's failure to sufficiently prove the FDIC insurance element.  See United States v. Neal, 36 F.3d 1190, 1207 (1st Cir. 1994) (defendants waived argument on appeal that evidence was

_____

[3] In United States v. Maner, 611 F.2d 107 (5th Cir. 1980), the court expressed concern over this identical problem.  "[W]e have difficulty comprehending why the Government repeatedly fails to prove this element more carefully since the Government's burden is so simple and straightforward."  Id. at 112.  We echo this plea to the government.  "Hopefully the Attorney General will sense and remedy this national deficiency by directions pointing out the simple ways to prove this simple but indispensable fact."  Id.

insufficient to support FDIC insurance element where they did not argue at trial that dismissal should be granted on that ground).

**Cross-examination of Dr. Harold Voth**

At trial, both sides presented expert testimony concerning Bindley's mental status. In particular, the government presented rebuttal evidence from Dr. Harold Voth, a psychiatrist, who rejected the conclusions of Bindley's psychologist that Bindley suffered from schizophrenia and diminished capacity. During cross-examination, Voth acknowledged he did not like drugs and had sent a letter to the editor of the local newspaper responding to a letter authored by Bindley's defense counsel advocating the legalization of marijuana. The district court denied Bindley's request to introduce the letters written by Voth and defense counsel into evidence. Bindley contends on appeal that Voth was biased against, and indeed "hated" defense counsel, because of their personal dispute concerning legalization of marijuana. He argues this animosity affected Voth's opinions and trial testimony, and the court erred in refusing to allow defense counsel to question Voth about this animosity and bias.

"We review de novo whether a defendant's Sixth Amendment confrontation rights were violated by cross-examination restrictions, and whether any such violation was harmless." United States v. Gault, 141 F.3d 1399, 1403 (10th Cir.

-10-

1998).  Because a defendant's right to cross-examine witnesses is neither absolute nor unlimited, "[t]he trial court retains broad discretion to limit cross-examination to prevent, among other things, undue prejudice and confusion of the issues."      Id. In reviewing a defendant's challenge to limitations on cross-examination, our role is to determine whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias.      Id.

We have reviewed Voth's testimony and conclude the jury had sufficient information to properly appraise his motives and any alleged bias.  The jury was made aware that Voth disliked drugs, that he had spent part of his military career working to reduce drug usage, and that Voth and defense counsel had a public dispute over legalization of marijuana.  Even though the district court refused to allow admission of editorials written by the two men, the limited cross-examination was sufficient to inform the jury of the dispute and to allow them to decide whether Voth's testimony was influenced by the dispute.  Further, although Bindley argues his counsel should have been allowed to question Voth further about the dispute, he offers no specific questions that should have been asked which would have actually demonstrated Voth's opinions concerning Bindley's mental capacity were in fact affected by his alleged animosity toward defense counsel.  As regards Voth's medical opinions concerning Bindley, the district court allowed defense counsel to fully explore and challenge these

opinions. In particular, defense counsel questioned Voth concerning the length of time he spent examining Bindley and his lack of reliance on any psychological testing in reaching his opinions.

Even assuming, arguendo, the district court erred in curtailing cross-examination and thereby violated Bindley's Sixth Amendment rights, the error is subject to harmless error analysis. See United States v. Desoto, 950 F.2d 626, 630 (10th Cir. 1991). To determine whether improper curtailment of cross-examination was harmless, we consider "'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.'" Id. at 630-31 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)). In the present case, Voth was not a critical witness to the prosecution's case. Although he disputed Bindley's expert's opinions concerning mental capabilities, in light of Penner's testimony that Bindley knew exactly what he was doing on the day of the robbery, opinions regarding mental capabilities ultimately appeared to have little impact on the outcome of the case. In the final analysis, the overall strength of the government's case was overwhelming and any error in this regard was harmless.

-12-

**Sentencing-reduction for acceptance of responsibility**

At sentencing, Bindley argued he was entitled to a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 because he told the truth about his involvement in the crimes and he raised only a technical defense at trial, i.e., lack of intent. The district court concluded Bindley was not entitled to the reduction because he "never accepted responsibility for his actions on June 1, 1996." Record I, Doc. 149. Bindley contends on appeal the court erred in refusing a reduction because he truthfully admitted what he did, he voluntarily withdrew from criminal conduct when he returned the pistol to Walters and indicated he could not go through with the robbery, he voluntarily and timely submitted to evaluation by the government's psychiatrist, and he agreed to seek counseling or drug treatment following trial.

The district court has broad discretion to determine whether to award a sentence reduction pursuant to § 3E1.1 for acceptance of responsibility, and we will not disturb its decision absent clearly erroneous findings. United States v. Cruz Camacho, 137 F.3d 1220, 1226 (10th Cir. 1998). The defendant bears the burden of establishing entitlement to a reduction under § 3E1.1. United States v. Nelson, 54 F.3d 1540, 1544 (10th Cir. 1995). To receive a reduction, the defendant must show "'recognition and affirmative acceptance of personal responsibility for his criminal conduct.'" United States v. McAlpine, 32 F.3d

-13-

484, 489 (10th Cir. 1994) (quoting U.S.S.G. § 3E1.1(a)). A "defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, application note 1(a).

Bindley testified he never discussed robbing the Bank with either Penner or Walters and that he first heard of the idea when Walters mentioned it while the three men were driving around on the morning of June 1, 1996. He testified he thought Walters was joking and he agreed to go along only because he "didn't want to seem like a punk." Record V at 217. He stated Walters handed him "something," but he could not remember if it was a pistol. He acknowledged he entered the Bank, obtained change for a five dollar bill, and walked back to the car, but claimed he then entered "a dream state" and was not aware Walters actually robbed the Bank. Further, he denied receiving any of the robbery proceeds and denied traveling to Lawrence with Penner and Walters on the afternoon following the robbery.

Penner painted a much different picture of Bindley's involvement, as is outlined in our previous discussion in response to Bindley's insufficiency of evidence contention. Penner stated Bindley was sober on the morning of the robbery and knew what he was doing, that Bindley and Walters planned the robbery, that Bindley purchased a compact disc to get a bag for the robbery

-14-

proceeds, that Bindley was involved in planning the escape route, that Bindley helped Walters put the money away while Penner drove, that Bindley shared in the robbery proceeds, that Bindley agreed not to talk about the crimes, and that Bindley traveled with Penner and Walters to Lawrence on the afternoon following the robbery. In short, Bindley did not truthfully admit his involvement in the charged crimes and was not entitled to a reduction for acceptance of responsibility.

**Involuntary intoxication defense**

At trial, Bindley testified that prior to the robbery he smoked a marijuana cigarette that must have been laced with another drug. He stated the marijuana cigarette tasted funny and made him feel different than he had felt after smoking other marijuana cigarettes. Based on this testimony, he requested an involuntary intoxication defense instruction. The district court refused, citing People v. Velez, 175 Cal. App. 3d 785 (1985), and concluded "[a] reasonable person has no right to assume that a marijuana cigarette furnished to him . . . will not contain PCP, nor may such a person assume such a marijuana cigarette will produce any predictable intoxicating effect." Record VI at 420. In denying Bindley's motion for new trial, the court further concluded "the evidence in support of this [involuntary intoxication] defense amounted to total speculation." Record I, Doc.

141 at 6.  The court did give a voluntary intoxication defense instruction.

On appeal, Bindley contends the district court erred in refusing to give an involuntary intoxication instruction.  A criminal defendant is entitled to a theory of defense instruction that is legally justified and supported by sufficient evidence for a jury to find in defendant's favor.  United States v. Wolny , 133 F.3d 758, 765 (10th Cir. 1998);  see also  United States v. Grissom , 44 F.3d 1507, 1512 (10th Cir. 1995);  United States v. Scafe , 822 F.2d 928, 932 (10th Cir. 1987).  We review de novo whether a district court committed reversible error in failing to submit a requested theory of defense instruction.  See Wolny , 133 F.3d at 765 (although a district court has substantial discretion in formulating instructions, the ultimate standard of review on appeal is de novo).

The defense of involuntary intoxication has received relatively little attention from the federal courts.  However, it has long been recognized, in various forms, by state courts.  See , e.g. , City of Minneapolis v. Altimus , 238 N.W.2d 851 (Minn. 1976) (discussing origins of involuntary intoxication defense);  see also  Phillip E. Hassman, *When Intoxication Deemed Involuntary So as to Constitute a Defense to Criminal Charge* , 73 A.L.R.3d 195 (1997) (cataloging cases).  Generally speaking, the defense has been recognized in four types of situations: (1) where the intoxication was caused by the fault of another (i.e., through force, duress, fraud, or contrivance); (2) where the intoxication was

caused by an innocent mistake on the part of the defendant; (3) where a defendant unknowingly suffers from a physiological or psychological condition that renders him abnormally susceptible to a legal intoxicant (sometimes referred to as "pathological intoxication"); and (4) where unexpected intoxication results from a medically prescribed drug. Altimus , 238 N.W.2d at 856-57; Hassman, *supra* § 2[a]. Although these widely varying circumstances make it difficult to formulate a comprehensive definition of the defense, it is apparent that a key component is lack of culpability on the part of the defendant in causing the intoxication. It is not surprising, then, that Bindley has cited no cases, and our research has produced none, in which the defense has been recognized where a defendant has knowingly ingested an illegal substance.

Velez , the California case cited by the district court, highlights why the involuntary intoxication defense has not been recognized in situations involving voluntary ingestion of illegal substances. In Velez , the defendant voluntarily smoked a marijuana cigarette given to him by others at a social gathering. Unbeknown to Velez, the cigarette contained PCP. Velez assaulted an elderly victim after he smoked the cigarette and was arrested and criminally charged. The two officers who arrested Velez testified at trial they thought he was under the influence of PCP. In addition, a psychologist and a psychiatrist testified his behavior was consistent with PCP ingestion. Notwithstanding this testimony, the

jury convicted Velez of assault with a deadly weapon. On appeal, the California

Court of Appeals concluded Velez was not entitled to any instructions on the

defense of involuntary intoxication.

> Boiled down to its essentials, defendant's defense was that he smoked marijuana given to him at a social gathering by others, but he did not in fact know it contained PCP, which produced an unexpected intoxicating effect. This defense depends on the validity of defendant's assumptions that the cigarette did not contain PCP and would produce a predictable intoxicating effect. However, . . . these assumptions are tested not by defendant's subjective belief but rather by the standard of a reasonable person. In this regard, it is common knowledge that unlawful street drugs do not come with warranties of purity or quality associated with lawfully acquired drugs such as alcohol. Thus, unlike alcohol, unlawful street drugs are frequently not the substance they purport to be or are contaminated with other substances not apparent to the naked eye. In particular, marijuana is frequently contaminated with PCP or other psychoactive drugs. Indeed, the reported decisions of the California appellate courts provide a ready compilation of cases involving "lacing" or "dusting" of marijuana with PCP.
> . . . .
> Putting aside the question whether a defendant may be precluded in all circumstances from invoking the absolute defense of involuntary intoxication where he has consumed an unlawful drug, we hold a reasonable person has no right to assume that a marijuana cigarette furnished to him by others at a social gathering will not contain PCP; nor may such a person assume such a marijuana cigarette will produce any predictable intoxicating effect. Absent these assumptions, defendant cannot contend he was involuntarily intoxicated, because he had no right to expect the substance he consumed was other than it was nor that it would produce an intoxicating effect different from the one it did. We therefore conclude defendant was voluntarily intoxicated as a matter of law.

175 Cal.App.3d at 795-96 (internal citations omitted).

The holding in Velez has been recognized by the Eighth Circuit. In United

-18-

States v. F.D.L., 836 F.2d 1113 (8th Cir. 1988), two juveniles were found guilty of involuntary manslaughter on an Indian reservation, and were adjudicated delinquent pursuant to 18 U.S.C. §§ 5031 and 5032. Although the evidence at trial indicated the two juveniles drank alcohol and smoked a marijuana cigarette that had likely been laced with PCP prior to the crime, the district court rejected their involuntary intoxication defense. In affirming the court's conclusion, the Eight Circuit recognized and essentially adopted the holding of Velez. Id. at 1117 ("Any intoxication resulting from [voluntary consumption of beer and smoking of marijuana cigarettes] would be no defense.").

After careful consideration, we conclude the holding of Velez is entirely reasonable and the district court properly adopted it in this case. As is the case with California law, both federal and Kansas state law make it illegal to ingest marijuana. Thus, the conduct that resulted in Bindley's intoxication (i.e., the smoking of a marijuana cigarette) was not innocent. Further, like any street drug, marijuana is not subject to any governmental standard which would insure the potency or purity of any given quantity of marijuana. Velez, 175 Cal. App. 3d at 796. Moreover, like the numerous California cases cited by the Velez court, reported federal cases suggest it is not at all uncommon to find marijuana cigarettes laced with PCP. See, e.g., United States v. Thomas, 114 F.3d 228, 237 (D.C.Cir.), cert. denied, 118 S.Ct. 635 (1997); United States v. Whren, 53 F.3d

371, 373 (D.C.Cir. 1995), <u>aff'd</u> 517 U.S. 806 (1996); <u>United States v. Williams</u>, 983 F.2d 1059, 1993 WL 2653 *1 (4th Cir. 1993), <u>vacated</u> 509 U.S. 901 (1993). Taken together, we conclude Bindley had no right to assume smoking the marijuana cigarette would produce a predictable effect. Stated differently, Bindley had no right to assume the marijuana cigarette, which he knew to be an illegal substance, was not laced with an adulterant. Thus, he cannot argue involuntary intoxication because, by voluntarily choosing to smoke the marijuana cigarette, any resulting intoxication (whatever that may have been) was likewise voluntary.

## III.

The judgment of the district court is AFFIRMED.